Oil Base, Inc. v. Commissioner.
Oil Base, Inc. v. Commissioner
Docket No. 2289-63.
United States Tax Court
T.C. Memo 1964-298; 1964 Tax Ct. Memo LEXIS 42; 23 T.C.M. (CCH) 1838; T.C.M. (RIA) 64298; November 17, 1964
Wilson B. Copes, 900 Wilshire Blvd., Los Angeles, Calif., for the petitioner. John W. Alexander, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioner's income tax for its fiscal year ended September 30, 1959, in the amount of $51,718.66. The issues for decision are: (1) Whether respondent properly included in petitioner's income under the provisions of section 482 of the Internal Revenue Code *43 of 1954 a portion of the commissions paid and discounts allowed to petitioner's wholly owned foreign subsidiary. (2) Whether respondent properly disallowed petitioner's deduction for all commissions paid to its wholly owned subsidiary on sales of petitioner's products in countries other than Venezuela. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is a California corporation with its principal place of business in Houston, Texas. Petitioner's income tax return for its fiscal year ended September 30, 1959, was filed with the district director of internal revenue for the Sixth District of California. During its fiscal year 1959 petitioner's principal place of business was in Compton, California. Petitioner is, and has been since prior to 1946, engaged in the business of manufacturing and selling oil base drilling fluid and related products to the oil drilling industry. Since approximately 1946 petitioner has been selling its products in certain foreign countries where oil drilling activity was being conducted. Petitioner's principal product is an oil base drilling fluid known as "Black Magic." Black Magic is a specialized *44 product for use in the oil drilling industry possessing certain qualities not found in water base drilling fluids. It produces highly desirable results in certain specialized oil well drilling situations. The product is more expensive than water base drilling fluids and is dirty and disagreeable to work with. For this reason petitioner considers it necessary to direct its selling efforts to all levels of oil drilling personnel ranging from the top production executives of an oil company down to the drilling crews. Generally, it requires more than one contact to result in a sale of petitioner's product. Service of the use of petitioner's products after a sale is also an important feature of petitioner's business. Petitioner maintains a staff of service engineers whose main duty is to service and supervise the use of its products by its customers. All of petitioner's sales and service engineers are trained in the use of petitioner's products and petitioner's top executives are likewise trained. A true oil base drilling fluid is used in approximately 2 percent of all oil wells drilled. There are several companies which manufacture and sell a true oil base drilling fluid, and these *45 companies other than petitioner are petitioner's direct competitors. Prior to October 1, 1955, petitioner's foreign sales had been accomplished through various independent sales representatives. On or about October 1, 1955, petitioner and Baritina de Venezuela, S. A., a Venezuelan corporation of Caracas, Venezuela (hereinafter referred to as Baritina), executed an agreement pursuant to which Baritina was to act as the exclusive sales representative for petitioner's products in the country of Venezuela. This agreement provided that Baritina would diligently and faithfully prosecute the sales of petitioner's products and would forward to petitioner all orders to be shipped by petitioner directly to Baritina's customers, that Baritina would pay its own costs and expenses and would maintain at its own expense an adequate and competent staff of sales engineers in connection with the selling and servicing of petitioner's products. It further provided that Baritina would send one or more persons to petitioner's Compton plant for instruction in the use and sale of petitioner's products. The agreement also provided that Baritina would not sell or attempt to sell any product similar to petitioner's *46 products without petitioner's consent. The agreement contained in addition other general provisions with respect to liabilities of the parties, claims, and prices of merchandise, and it contained the following provision with respect to Baritina's commissions and discounts: 8. First Party (OIL BASE, INC.) agrees to pay to Second Party [Baritina] as commissions upon merchandise shipped directly by First Party to the consumers within Second Party's territory, as hereinafter set forth under heading (a) of this paragraph contained; First Party does further agree to allow Second Party discounts from its list price of merchandise hereinafter listed as may be purchased by Second Party from First Party for resale and stocked or warehoused by it, as hereinafter set forth under headings (b) and (c) of this paragraph contained: (a)
(b)
(c)
Net 90 days
Net 30 days
from date
from date
(commis-
of invoice
of invoice
sion)
(discount)
(discount)
OB Wate
15%
17 1/2%
20%
Filer Presses
15%
17 1/2%
20%
Chemical "V"
15%
17 1/2%
20%
OB Zero
15%
17 1/2%
20%
Mix Fix
15%
17 1/2%
20%
Additive "E"
15%
17 1/2%
20%
Sacked Black
Magic
20%
22 1/2%
25%
OB Gel
20%
22 1/2%
25%
OB Gen
20%
22 1/2%
25%
White Magic
20%
22 1/2%
25%
Economagic
20%
22 1/2%
25%
Peptomagic
20%
22 1/2%
25%
No-Glo Oil
20%
22 1/2%
25%
No-Glo
Thread Lu-
bricant
20%
22 1/2%
25%
Special Addi-
tive 58
20%
22 1/2%
25%
Formaseal
20%
22 1/2%
25%
Mud Guns
20%
22 1/2%
25%
Well Wash
20%
22 1/2%
25%
Chemical
"W"
20%
22 1/2%
25%
Black Magic
Premix
20%
22 1/2%
25%
Hand Cleaner
20%
22 1/2%
25%
*47 The foregoing may be amended in writing endorsed thereon. On or about December 1, 1955, petitioner and Baritina executed a document entitled, "Supplemental Agreement" pursuant to which the country of Colombia was added to the territory for which Baritina was to be the exclusive representative of petitioner's products. This supplemental agreement further provided that A Z Export, S. A., a corporation, was to be named as the exclusive subagent and distributor of petitioner's products in the Republic of Columbia. The agreement between petitioner and Baritina with the supplement including sales in the Republic of Columbia, remained in force through September 30, 1957. After September 30, 1957, and during the period of time in which Baritina and petitioner were negotiating in an effort to reach a new agreement Baritina continued to sell petitioner's products even though no written contract in this respect between the two parties was in effect. Prior to October 1, 1955, while petitioner was represented by independent sales representatives in selling its products in foreign countries petitioner sent personnel from its own plant to assist its sales representatives in the sales and *48 servicing of petitioner's products even though some of the sales representatives had personnel who had been trained in the uses and applications of petitioner's products. During the time that Baritina was representing petitioner, petitioner furnished Baritina one of its own experienced engineers who went to Venezuela and became employed by Baritina. This engineer while employed by Baritina, worked primarily on sales of petitioner's products. After the termination of the agreement between petitioner and Baritina on September 30, 1957, the two companies negotiated for the renewal and modification of the agreement. These negotiations consisted of correspondence between the two companies, and representatives of petitioner and a representative of Baritina had one personal conference. The personal conference took place in petitioner's offices at Compton, California, and petitioner was represented by its president and executive vice president, and Baritina by its assistant general manager. Petitioner's representatives, in these negotiations, took the position that since 40 percent of Baritina's stock had been acquired by National Lead Company, which operated a division called the Baroid *49 Division which was a direct competitor of petitioner, petitioner should have protection with respect to the time period of the contract and quantity of inventory carried by Baritina. In addition, petitioner wanted Baritina to erect a premix plant in order that petitioner's products might be shipped in a dry state to Venezuela and mixed in liquid form in that country. Petitioner also wanted Baritina to agree to send four or more persons to its plant at Compton for training. During the course of the negotiations Baritina requested higher commissions and discounts. At the personal conference between representatives of petitioner and of Baritina, petitioner's representatives received the impression that the representative of Baritina had authority to agree to a contract on behalf of Baritina and at the conclusion of the conference were under the impression that an agreement had been reached between the two companies regarding the provisions of a new contract. In accordance with this understanding petitioner's president, under date of March 10, 1958, submitted to the general manager of Baritina a proposed new contract to be entered into between the two companies as of April 1, 1958, which *50 proposed contract he understood to be in accordance with the agreement reached at the personal conference. The proposed agreement submitted by petitioner's president to Baritina with a letter dated March 10, 1958, was for a period of 1 year and contained, among its provisions, the following: 3. Baritina agrees to: * * *
(e) Maintain at its own expense an adequate and competent staff of "sales engineers" in connection with the selling and servicing of Oil Base's products, it being agreed that service by trained and skilled personnel is necessary to the proper use by the consumer of Oil Base's products and to the proper sales coverage thereof. In connection with the foregoing, Baritina agrees to send four or more persons to Oil Base's plant at Compton, California, within a period of one hundred twenty (120) days from date hereof for instruction in the use, and sales procedures adopted by Oil Base in connection with the consumer use and sale of its products, to wit: For instruction as a "sales engineer" as said term is herein used. All transportation, living, maintenance, and salary expenses of and for such persons shall be borne and paid by Baritina; provided, however, that *51 Baritina may at its option in lieu of sending the aforedescribed four persons for training at Oil Base's plant at Compton, California, as sales engineers, request Oil Base to send one of its trained sales engineers to Venezuela to train and instruct said four persons as sales engineers, all expenses of said representative, including salary, to be borne and paid by Baritina. The request and sending of said representative as last described shall constitute full performance of this Subparagraph (e) by Baritina. * * *
9. Baritina agrees to maintain at all times during the existence of this agreement a minimum stock of Oil Base material in the following quantities at the listed points or warehousing sites, to wit: * * *
* * * Having this in mind, Baritina agrees that the aforedescribed inventory shall never at any time during the term of this Agreement or extension hereof be allowed to go below and remain below a minimum purchase price value of $100,000.00, * * * 10. It is understood that Baritina has made certain sales of all Oil Base's products in Colombia and Venezuela during the months of October, 1957, through March, 1958 during which times Baritina had no sales representation *52 agreement with Oil Base and no agreement with respect to payment by Oil Base of any commissions to Baritina on account of said sales, it being further agreed that calculated amounts of said commissions exceeds $15,000.00. In consideration of Oil Base paying said described commissions in such exact amount as the same may appear and be, Baritina agrees to immediately erect at its sole expense a premix plant in accord with bluprints [blueprints] furnished to Baritina by Oil Base. Said premix plant shall be erected at Las Morochas, Venezuela, for use in the processing, storage and sale of Oil Base products. Payment of said described commissions shall be made when said plant is erected and in operation. * * *
14. Baritina agrees that it will maintain two trained sales engineers (trained as provided in paragraph 3(e)) resident in the Republic of Colombia at all times during the existence of this Agreement. * * * The commissions and discounts set forth in the proposed agreement were identical to those which had been contained in the prior agreement between petitioner and Baritina. The term of 1 year in the contract was in accordance with information that the assistant general manager *53 of Baritina had given to representatives of petitioner subsequent to the personal conference between representatives of the two companies to the effect that the general manager of Baroid Sales Division of National Lead Company would agree to a 1-year term only for the contract. Subsequent to the submission of the proposed contract to Baritina by letter dated March 10, 1958, further correspondence took place between representatives of petitioner and representatives of Baritina in which the representatives of Baritina stated that Baritina could not agree to the new provision of the proposed contract which required Baritina to keep a minimum inventory and to construct a premix plant in Venezuela. The estimated cost of construction of the premix plant was approximately $25,000. In a letter dated March 17, 1958, from the assistant general manager of Baritina to petitioner's president discussing the proposed new contract, the following statement was made: We are more than willing to continue on the basis of the old contract, making whatever new arrangements within reason which you feel are necessary in Columbia [Colombia]. This would mean putting at least one permanent sales and *54 service representative in Bogota. In Venezuela, we must be clear in stating that we cannot agree to building a Mixing Plant or maintaining minimum inventories at the present time. May we hope that you can see your way clear to extend the old contract or a modified form of the new contract excluding those portions commented on in the preceding paragraphs. At the time the negotiations were being carried on with respect to a new contract between petitioner and Baritina, the latter company was maintaining in Venezuela an inventory of petitioner's products in an amount of approximately $85,000. The proposed new contract between petitioner and Baritina was never executed and negotiations were terminated in April of 1958. After termination of negotiations between petitioner and Baritina regarding the new contract, petitioner's management gave consideration to the best method of marketing petitioner's products in foreign countries. After consulting counsel in Los Angeles, California and a Venezuelan attorney, petitioner's board of directors decided to form a wholly owned Venezuelan corporation to act as petitioner's sales representative in foreign countries. On or about July 13, 1958, petitioner *55 caused the formation of Oil Base de Venezuela, C.A., a Venezuelan corporation (hereinafter referred to as Oil Base, Venezuela) as a wholly owned subsidiary of petitioner. Oil Base, Venezuela was organized with a paid-in capital of $6,000 and at no time during the fiscal year ended September 30, 1959, was this paid-in capital increased. On or about June 20, 1958, petitioner and Oil Base, Venezuela, executed an agreement pursuant to which Oil Base, Venezuela, was to act as petitioner's exclusive sales representative for the sale of petitioner's products in all countries of the world except all of the States of the United States and all of the Provinces and Dominions of Canada. Section 8 of this agreement provided as follows: 8. O.B.I. agrees to pay O. B. Ven., as commissions upon merchandise shipped directly by O.B.I. from any of its plants or warehouses located in the United States of America to a customer located within O.B. Ven.'s territory, such sum as will represent twenty per cent (20%) of the net invoice billings of said sales, exclusive of transportation, packaging, insurance and taxes, of those products of O.B.I. known as OB Wate, Filter Presses, Additive "V", OB Zero, Mix-Fix, *56 Additive "X" and Additive "E"; and such sum as will represent forty per cent (40%) of the net invoice billings of sales, exclusive of transportation, packaging, insurance and taxes, of all other of O.B.I.'s products. O.B.I. does further agree to allow O.B. Ven. discounts of twenty per cent (20%) from its established export list price of its products, exclusive of freight, taxes and special charges for export crating, known as OB Wate, Filter Presses, Additive "V", OB Zero, Mix Fix, Additive "X" and Additive "E"; and discounts of forty per cent (40%) from its established list price, exclusive of freight, taxes and special charges for export crating, on all other of O.B.I.'s products. If such commissions are due O.B. Ven. because of direct purchases made from O.B.I. by customers operating in O.B. Ven.'s territory as aforedescribed, such commissions shall be determined and paid on the 20th day of the month next succeeding the month in which payment is made to O.B.I. by such customers. The agreement between petitioner and Oil Base, Venezuela, was for a period commencing June 20, 1958, and ending January 1, 1959, but this agreement was extended for an additional year to December 31, 1959. The *57 agreement between petitioner and Oil Base, Venezuela, made no requirement of a minimum inventory to be maintained by Oil Base, Venezuela, for the erection of a premix plant, the training of four sales engineers in petitioner's plant, or the maintenance of two sales engineers in Colombia. On July 1, 1958, Oil Base, Venezuela, entered into a written agreement with M. R. Vollmer and M. L. Cooper referred to in the agreement as "Volco", under which Volco was designated as exclusive sales representative of petitioner's products in the country of Colombia. Under the provisions of this agreement Volco was to receive a 10 percent commission on products shipped directly by Oil Base, Venezuela, to customers within the country of Colombia. This agreement obligated Volco to maintain two trained sales engineers in the Republic of Colombia at all times during the existence of the agreement. By assignment agreement dated November 24, 1958, the agreement between Oil Base, Venezuela, and Volco was assigned to Volco, Inc., a corporation of the country of Panama. Volco, Inc., was a corporation formed by M. R. Vollmer and M. L. Cooper. The assignment was agreed to by Oil Base, Venezuela. Prior to *58 July 1, 1958, M. R. Vollmer and M. L. Cooper were representatives of an agent of Baritina in the Republic of Colombia and in that capacity sold and serviced petitioner's products in Colombia. On October 1, 1958, Oil Base, Venezuela, entered into an agreement with Servicios Petroleros, S.A., a Peruvian corporation (hereinafter referred to as Servicios), under which Servicios was designated as the exclusive sales representative of petitioner's products in the country of Peru. This contract provided for the same commissions and discounts which had been provided for in petitioner's contract with Baritina and in the proposed contract of April 1, 1958, between petitioner and Baritina. On October 1, 1958, Oil Base, Venezuela entered into an agreement with Gene L. Towle, under which Towle was designated as the exclusive sales representative of petitioner's products in Mexico. This contract provided for the same commissions and discounts as had been allowed by petitioner to Baritina and as set forth in the proposed contract of April 1, 1958, between petitioner and Baritina. The contracts between Oil Base, Venezuela and its three subagents were each signed by the president of Oil Base, *59 Venezuela, who was also petitioner's president. The agreement between Oil Base, Venezuela, and Volco, Inc., covering the period beginning July 1, 1959 and ending September 30, 1960, provided for commissions to be paid and discounts to be allowed to Volco, Inc., in the same amounts as had been allowed by petitioner to Baritina and as were being allowed to Servicios and Gene L. Towle. On October 1, 1958, petitioner and Milwhite Mud Sales Co., Ltd. (hereinafter referred to as Milwhite), entered into a contract under which Milwhite was designated as the exclusive sales representative for petitioner's products in the Provinces of Alberta and Saskatchewan, Canada. The commissions and discounts allowed to Milwhite under this contract were exactly the same as those which had been allowed by petitioner to Baritina and which were set forth in the proposed contract of April 1, 1958, between petitioner and Baritina. Petitioner's agreement with Milwhite was for a 1-year period and was extended for an additional period to October 1, 1960. During the period beginning June 20, 1958, and continuing until about December 20, 1958, Richard Newman was the only full-time employee of Oil Base, Venezuela. *60 Newman was stationed in Puerto La Cruz, Venezuela. Prior to being employed by Oil Base, Venezuela, Newman had been employed as a sales engineer by Baritina in Venezuela and in that capacity he had sold and serviced petitioner's products. Prior to becoming employed by Baritina, Newman had been employed as a sales engineer for petitioner. Newman severed his connections with Oil Base, Venezuela about December 20, 1958. A period of approximately 2 weeks expired before Newman's replacement arrived in Puerto La Cruz, Venezuela. Newman's replacement was a man named White who had been employed by petitioner prior to becoming employed by Oil Base, Venezuela. White took over his duties with Oil Base, Venezuela, shortly after January 1, 1959. White was the only fulltime employee of Oil Base, Venezuela, from the time he became so employed throughout the balance of the fiscal year ended September 30, 1959. Newman while employed by Oil Base, Venezuela, and White when he replaced Newman, served as sales engineer, service engineer, and general manager of Oil Base, Venezuela. Shortly after Oil Base, Venezuela, was organized, a public accountant located in Venezuela was paid $75 to open a set of *61 books for the newly organized corporation and it was agreed that this accountant would be paid for bookkeeping service for the corporation and in addition, with no additional charge, he would permit Oil Base, Venezuela, to use his post office box number in Puerto La Cruz and furnish an office for the general manager of Oil Base, Venezuela, to occupy from time to time. This accountant had other clients besides Oil Base, Venezuela. It was agreed that the payment for services, without any additional charge for the use of the post office box and furnishing an office, would be approximately $150 per month. The accounting practice of the accountant with whom Oil Base, Venezuela, made the arrangement was purchased around the first of May 1959 by an accounting firm which continued the same arrangement with Oil Base, Venezuela. During the fiscal year ended September 30, 1959, the president and vice president of petitioner, who were also the president and executive vice president of Oil Base, Venezuela, made a trip to Venezuela, and during the course of the trip visited Mexico and Colombia. Most of the time the two officers of petitioner and Oil Base, Venezuela, were traveling together. In *62 the business dealings conducted in Venezuela, they represented themselves as officers of Oil Base, Venezuela. During some of the trip, the two officers were accompanied by Newman, the manager of Oil Base, Venezuela. On the trip in Colombia, petitioner's two officers were accompanied by the Colombian agents who handled petitioner's products and represented themselves as officers of Oil Base, Venezuela. In accordance with the agreement between Oil Base, Venezuela, and petitioner, each of the companies bore one-half of the expense of the trip made by these officers to Venezuela, Colombia, and Mexico. It had been petitioner's consistent practice during the years that it was marketing its products in foreign countries to send its employees to the countries in which its products were being sold for the purpose of assisting its sales representatives and servicing the use of its products. Petitioner's assistant sales manager was usually the representative sent to Venezuela and Colombia, and while on such trips he actually went to the site where petitioner's products were being used and serviced the use of petitioner's products. The expense of these trips was borne solely by petitioner. *63 As of September 30, 1958, Oil Base, Venezuela, had inventory of a value of $21,809 stored at a leased warehouse at Puerto La Cruz, Venezuela; and as of September 30, 1959, it had inventory stored at this warehouse of a value of $27,764. As of these same dates Oil Base, Venezuela, owned office equipment which had a cost of $758 and an automobile which had a cost of $3,611; and as of September 30, 1959, Oil Base, Venezuela, owned furniture for a manager's house which had a cost of $1,200. During the fiscal period ended September 30, 1958, and the fiscal year ended September 30, 1958, and the fiscal year ended September 30, 1959, Oil Base, Venezuela, leased a warehouse in Puerto La Cruz for Bs.500 per month. During the fiscal year 1959 it required three and one-third bolivars (Bs.) to equal one United States dollar. During the fiscal period ended September 30, 1959, Oil Base, Venezuela, leased a manager's house located at Phillips Camp at San Roque, Venezuela, for a monthly rental of Bs.800 and a house located at Nalco Camp, Anaco, for a monthly rental of Bs.1,000. For the fiscal year ended September 30, 1959, Oil Base, Venezuela, was charged for services rendered, $3,136.33 and *64 $1,055.33 of the salaries paid by petitioner to its president and vice president, respectively, who were also the president and executive vice president of Oil Base, Venezuela. In addition petitioner's treasurer also rendered services for Oil Base, Venezuela, and for such services rendered by the individual who was petitioner's treasurer until July 1959, Oil Base, Venezuela, was charged $275.40 and for services rendered by the individual who became petitioner's treasurer on July 1, 1959, Oil Base, Venezuela, was charged $117.63 for services rendered during the fiscal year ended September 30, 1959. Oil Base, Venezuela, had net income and retained earnings of $18,208 for the 3 1/2 month period ended September 30, 1958, and a net income of $81,031 for its fiscal year ended September 30, 1959, and retained earnings of $99,259 for the fiscal year ended September 30, 1959. Petitioner's direct profit from sales for its fiscal years ending September 30, 1956, 1957, 1958, and 1959, expressed as a percentage of total gross sales, the similar direct profit for domestic sales expressed as a percentage of those sales, and export sales expressed as a percentage of such sales are as follows: Fiscal years ended September 30 -
1956
1957
1958
1959
Percent
Total
24.7
21.6
32.0
23.0
Domestic
22.4
14.0
21.2
22.5
Export
34.6
30.1
45.6
23.9
*65 Direct profit used in computing these percentages represents the profit after deducting from gross sales all discounts and commissions allowed, manufacturing costs of the goods sold, any patent royalties paid with respect to the goods sold, and the direct selling expenses including salesmen's expenses, salaries, and entertainment expenses. Throughout the fiscal year ended September 30, 1959, petitioner owned all of the outstanding capital stock of Oil Base, Venezuela. Each of the officers and directors of Oil Base, Venezuela, was also an officer of petitioner. In May of 1958, prior to the organization of Oil Base, Venezuela, petitioner's vice president made a trip to Venezuela and Colombia, at which time he discussed with Newman, who was then employed by Baritina, employment in Venezuela by petitioner's proposed subsidiary. He also discussed with Vollmer and Cooper in Colombia their serving as sales representatives for petitioner's products in Colombia. At that time Vollmer and Cooper were employees of the subagent who was the distributor of petitioner's products in Colombia on behalf of Baritina. Certain officers of petitioner who were also officers of Oil Base, Venezuela, *66 carried on extensive correspondence on behalf of Oil Base, Venezuela, from petitioner's offices in Compton, California. Although the letterhead of Oil Base, Venezuela, was used for this correspondence, such correspondence was actually written in Compton, California by secretaries who were full-time employees of petitioner. During the fiscal year ended September 30, 1959, between 80 and 85 percent of the sales of petitioner's products in the Republic of Colombia were made to Texas Petroleum Company in Colombia. Some of the sales resulted from orders sent by Texas Petroleum Company's New York City office to petitioner in Compton, California with directions that the order was to be shipped to Texas Petroleum Company in Colombia. Petitioner would then prepare documents showing petitioner as the shipper and Texas Petroleum Company, Colombian Division, as the consignee and purchaser. Petitioner on its Federal income tax return for its fiscal year ended September 30, 1959, reported taxable income of $20,457.80. Respondent in his notice of deficiency, in addition to making adjustments which, though originally placed in issue in the petition in this case, have now been disposed of by *67 agreement of the parties, increased petitioner's reported income by an amount of $106,699.14 designated as "Sales increased" and made the following explanation of this adjustment: It is determined that commissions paid and discounts allowed to your controlled foreign subsidiary, Oil Base de Venezuela, C.A. were excessive in amount and had the effect of improperly shifting income from you to your controlled foreign subsidiary, thereby distorting your income and the income of your subsidiary. Furthermore, sales commissions were paid to Oil Base de Venezuela on certain sales occurring outside of Venezuela which were, in substance, your sales and on these sales no commissions are being allowed under this determination. In determining the proper amount allowable as commissions and discounts paid to Oil Base de Venezuela, C.A. where some amount is properly allowable, the determination has been based on arm's length negotiated rates between yourselves and uncontrolled parties on identical goods and services. This issue involves the application of sections 61 and 482 of the Internal Revenue Code of 1954. * * * Opinion Petitioner recognizes that it and Oil Base, *68 Venezuela, are organizations owned and controlled by the same interests within the meaning of section 482 of the Internal Revenue Code of 1954. [1] Petitioner contends that under that section respondent has erroneously used, in the reallocation of gross income deductions, credits, or allowances between petitioner and its subsidiary, a standard of arm's length bargaining. Petitioner points out that no such provision is contained in the statute and that although respondent's regulations [2] contain a statement that the standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer, no such standard has been applied by the courts. *69 Petitioner relies primarily upon Frank v. International Canadian Corporation, 308 F. 2d 520 (C.A. 9, 1962), and cases cited and discused in that case. Petitioner relies particularly on the following paragraph in Frank v. International Canadian Corporation, supra: For example, it was not any less proper for the district court to use here the "reasonable return" standard than it was for other courts to use "full fair value," [8] "fair price, including a reasonable profit," [9] "method which seems not unreasonable," [10] "fair consideration which reflects arm's length dealing," [11] "fair and reasonable," [12] "fair and reasonable" or "fair and fairly arrived at," [13] or "judged as to fairness," [footnote omitted] all used in interpreting § 45 [of the Internal Revenue Code of 1939, the predecessor of Sec. 482]. *70 It is petitioner's position that since it retained a slightly higher percentage of direct profit from export sales than from domestic sales even after allowance of commissions and discounts to its subsidiary in accordance with their contract, it has established, under the criteria of Frank v. International Canadian Corporation, supra, that it retained a reasonable return. It is unnecessary for us to decide whether the sole standard in cases under section 482 is one of an amount which would be arrived at in arm's length transactions between unrelated parties. The commissioner has been given much latitude in his use of section 482 when necessary to prevent the evasion of Federal income tax by shifting of profits between taxpayers subject to common control. Ballentine Motor Co., 39 T.C. 348, 357 (1962), affd. 321 F. 2d 796 (C.A. 4, 1963). The burden is on petitioner to show error in respondent's allocation, and respondent's determination must be sustained unless it is unreasonable, arbitrary, or capricious. Grenada Industries, Inc., 17 T.C. 231, 255 (1951), *71 affd. 202 F. 2d 873 (C.A. 5, 1953), certiorari denied 346 U.S. 819. There is no evidence to show that the percentage return retained by petitioner on domestic sales would represent a reasonable return on its export sales. There is likewise no evidence to show that the amount of commissions and discounts paid to Oil Base, Venezuela, represented a reasonable amount, a fair amount, or an amount which would meet any of the other criteria referred to by the Court in Frank v. International Canadian Corporation, supra.Certainly the fact that these commissions are almost double those paid by petitioner to unrelated persons in arm's length transactions is evidence that they were not fair and reasonable. Petitioner justifies the rates established for Oil Base, Venezuela, which were about twice the amounts it had been paying to Baritina and was currently paying to its representative in Canada, as well as about twice the amounts which its distributors, though classed as subagents of Oil Base, Venezuela, were charging in other countries, by stating that petitioner's board of directors considered a number of factors in arriving at the rates of commission *72 and discount. The factors which petitioner stated were considered were that Baritina had represented to petitioner that it had just about been breaking even with respect to its representation of petitioner; that Oil Base, Venezuela, would be handling only petitioner's products whereas Baritina had handled noncompeting products of several other manufacturers and consequently had a broader base over which to spread its overhead costs; that Oil Base, Venezuela, would be starting from the very beginning whereas Baritina was an established and going concern; the manufacturing costs of the products involved which, of course, were known to petitioner as well as the selling price of the products; the high cost of operating in Venezuela and Colombia which was known to petitioner's management; and that it would be necessary for Oil Base, Venezuela, to obtain subagents and distributors in various foreign countries and to pay them commissions on sales made in those countries. None of the alleged reasons justifies the rate of commissions and discounts allowed to Oil Base, Venezuela. Petitioner, in its proposed contract with Baritina had not increased the rate of commissions and discounts although *73 it was insisting on minimum inventory to be maintained by Baritina, the building of a premix plant, and the training of several sales engineers. It would, therefore, appear that if personnel of Baritina had represented to petitioner that Baritina had just about been breaking even with respect to representation of petitioner, petitioner was not impressed with this representation to the extent that it was considering the raising of commissions for Baritina or withdrawing from some of the additional demands it was making upon Baritina. The second contention is likewise unimpressive. Oil Base, Venezuela, had only one full-time employee, who was the same person who as an employee of Baritina had devoted full time to petitioner's products. This arrangement was made prior to the incorporation of Oil Base, Venezuela. Petitioner does not explain why it considered a concern that was merely beginning in business to be entitled to a higher commission than a going concern with a number of employees. Petitioner has shown no reason why its knowledge of the gross profits from its sales should persuade it to allow commissions to its subsidiary about twice those it had previously paid, other than *74 the inference that respondent would draw of shifting income to Oil Base, Venezuela. The high operating costs in Venezuela would not affect Oil Base, Venezuela, to an appreciable extent since its manner of operation had been set prior to its incorporation. Petitioner's last point is not well taken since it has not shown why Oil Base, Venezuela, should have any appreciable profit on sales made by subagents in other foreign countries. All of the evidence of record in this case indicates that a fair and reasonable commission and discount to be allowed to Oil Base, Venezuela, is the amount of commission and discount that had been allowed to Baritina, was proposed in the new contract to be allowed to Baritina, and was allowed to petitioner's representative and various subagents with the exception of a lower commission being allowed to the Colombian representative for a short period of time. See Jesse E. Hall, Sr., 32 T.C. 390 (1959), affd. 294 F. 2d 82 (C.A. 5, 1961). We sustain respondent with respect to his determination of the amount of commission properly allowable on sales in Venezuela. The evidence clearly shows that petitioner needed sales representatives *75 in Colombia and Mexico and that some commissions or discounts were necessary to obtain such representatives. Respondent's action in disallowing all commissions and discounts on such sales is unreasonable and arbitrary. During the time Baritina represented petitioner, that company handled petitioner's sales in Colombia through a subagent at the same commissions and discounts paid to it for sales in Venezuela. Petitioner has failed to show why commissions and discounts on sales in Colombia, Mexico, and Peru, if any, paid to Oil Base, Venezuela, should be different from those allowed to Oil Base, Venezuela, on sales in Venezuela. The agreements with the various subagents were for amounts of discounts and commissions identical to those paid by petitioner to Baritina and to its Canadian representative, and which respondent recognizes as proper to be allowed to Oil Base, Venezuela, on sales in Venezuela, except for a short period of the contract with Volco in Colombia. However, petitioner has shown no services performed by Oil Base, Venezuela, which would entitle it to a profit on these sales. In this state of the record, we conclude that the same rates of commissions and discounts which *76 respondent has allowed to petitioner in computing its deductions with respect to sales in Venezuela are allowable to determine the proper deduction by petitioner with respect to sales in Colombia, Mexico, and Peru. We therefore hold that the rates of commissions allowed by respondent with respect to petitioner's Venezuelan sales are also proper with respect to all sales of petitioner's products in Colombia, Mexico, and Peru made through Oil Base, Venezuela, during the fiscal year ended September 30, 1959, in computing the amount of the commissions paid by petitioner to its subsidiary which is properly deductible by petitioner in determining its taxable income for its fiscal year 1959. [3]
Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise indicated. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS: In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. ↩
2. Sec. 1.482-1(b) [Income Tax Regs.] Scope and purpose. (1) The purpose of section 482↩ is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.
8. The Friedlander Corp., 1955, 25 T.C. 70, 77↩. 9. Grenada Industries, Inc., 1951, 17 T.C. 231, 260, affirmed 5 Cir., 202 F. 2d 873, certiorari denied, 346 U.S. 819, 74 S. Ct. 32, 98 L. Ed. 345↩. 10. Motor Securities Co., Inc., 1952, 11 TCM 1074↩, 1082. 11. Palm Beach Aero Corp., 1952, 17 T.C. 1169, 1176↩. 12. Polak's Frutal Works, Inc., supra 21 T.C. 953 (1954)] 21 T.C. at 975-976.↩
13. Seminole Flavor Co., 1945, 4 T.C. 1215, 1232↩.
3. Joint Exhibits 26-P and 27-Q, stipulated exhibits incorporated herein by reference, show the necessary information from which this computation may be made.↩